(No. 36492-3.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* ROOSEVELT SCOTT, Appellant.

*Opinion filed Sept. 27, 1963.—Rehearing denied Nov. 25, 1963.*

PRENTICE MARSHALL, and JOHN J. CROWN, of Chicago, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and EDWARD J. HLADIS, JAMES R. THOMPSON, and WILLIAM J. MARTIN, Assistant State's Attorneys, of counsel,) for the People.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Gertrude Rhinehardt and John Schot were killed on November 17, 1959, and defendant Roosevelt Scott was named in separate murder indictments which were subsequently, on motion of defense counsel, consolidated for trial before a jury in the criminal court of Cook County. The jury found defendant guilty and fixed his punishment at death. The consolidated cases are here for review on appeal.

The record in this case, comprising some 3000-odd pages, indicates that Gertrude Rhinehardt, about 90 years of age, owned an apartment building at 1927 West Jackson Boulevard in Chicago where she lived in a first-floor apartment, while her nephew, John Schot, aged 72, occupied a basement apartment. They owned a large Collie dog and a small black one. About one o'clock on the morning of Tuesday, November 17, 1959, Marie Gilman, a widow living alone in a second-floor apartment of the same building, was awakened by what she described as "an uncanny yell or scream." She left her apartment and went to the head of the stairs leading to the first floor; looking down the stairway

she saw a light colored Negro man coming out of Mrs. Rhinehardt's apartment. He had on a vivid red shirt which buttoned all the way down the front and had long sleeves. Mrs. Gilman asked the man what he was doing and he replied that John Schot and he were painting and that John had sent him up for some paint. She asked why the dog had screamed and the man said it had cancer of the leg and had fallen down stairs. They stood there talking for a few minutes during which the man invited her downstairs so John could tell her everything was all right, but Mrs. Gilman did not go down. She then returned to her room, but could not sleep and about fifteen minutes later she arose, went downstairs and outside the building and looked around. Hearing nothing, she re-entered the building. About half way up the stairs to her apartment she heard a sound like a door opening, and she ran back to her apartment where she heard nothing further. Shortly thereafter the odor of something burning became noticeable and smoke billowed in when she opened her door. Arousing other people living on the second floor, she fled from the building which was on fire. Several people tried to arouse Mrs. Rhinehardt and Schot but got no answer.

The fire department was called shortly after 3:00 A.M. and while extinguishing the blaze the bodies of Mrs. Rhinehardt and Schot were found in their respective apartments. Mrs. Rhinehardt's body was on her bed bearing severe wounds about the face and neck, and Schot's body was found on the floor of his apartment severely wounded on the face, neck and head. Immediately following the discovery of the bodies police officers began an investigation which started with the interrogation of Mrs. Gilman. She was taken to the Warren Avenue station about 5:00 that morning and a typed statement was taken from her which was torn up. A second statement was torn up and, finally, a third statement was taken in which Mrs. Gilman said a man who had been painting the back porch would fit the general descrip-

tion of the man she had seen in the hall. This man was arrested later that evening, but Mrs. Gilman then said he was not the man to whom she had spoken. Later on the evening of November 17, the police took another typewritten statement from Mrs. Gilman in which she described the man with whom she had spoken as a slender light-skinned mulatto Negro with a soft voice, and stated that she could not see his face because he had on a brimmed hat which hid it. She also stated that there were two lights in the hallway, one toward the back where the door to the basement was and one near the front entrance to Mrs. Rhinehardt's apartment. The back light was on, the front one was not. The man stood beneath the front light, and because it was out she couldn't see him too well.

During the ensuing week Mrs. Gilman was taken to the Warren Avenue police station on seven or eight occasions to view suspects being interrogated by police and she was unable to identify any of them. On the night of November 24, 1959, about 9:00 P.M. she was again taken to the Warren Avenue station. While sitting on a bench there she overheard a voice which she thought she recognized, and looking in the adjoining room she saw the man with whom she had spoken in the apartment hallway, wearing the same "vivid red shirt", which was "identical, in color, texture, buttons and everything." She told police officers Pates and Slaughter, both of whom she knew by this time, that, "You have got your man, finally. You don't have to bother anymore". She further said to them, "It is funny he didn't change his clothes, he must be awful stupid." However, she was not requested to and did not confront the man with her identification. The man was Roosevelt Scott, who had been taken into custody about 10:45 that evening in the lobby of the Royalton Hotel at 1810 West Jackson Boulevard, one block east of the scene of the killings. He had been placed in a squad car and taken to the Warren Avenue police station, arriving there about 11:00 P.M.

Some confusion existed in Mrs. Gilman's statement as to whether the light in the hallway, beneath which was standing the man later identified by her as defendant, had been lighted at the time of her conversation with him, and she had also made conflicting statements as to whether this person wore a hat on that occasion. She gave contradictory answers as to whether the officers had shown her any red shirts, and her testimony at the trial that the defendant was wearing the same clothing, including the red shirt, at the time she identified him at the police station as he was wearing the night of the murder was contradicted by all other witnesses who remembered defendant's clothing when he was brought to the station.

Upon his arrival Scott was taken to the second floor juvenile room at the police station and Pates and Slaughter began to question him about his acquaintance with Schot and about the killings. Shortly thereafter Lt. Flynn arrived and he then took charge of the interrogation. An hour or so later officers Vincent and Jones came in, and they also participated. It appears that one or the other of these five men interrogated the defendant for about four hours. Around three o'clock A.M. on the morning of November 25 he was told that he was under arrest on "suspicion of murder," after the officers had checked an alibi witness, one Diverna Day, who denied being with defendant on the night of November 17 as claimed by him. The interrogation continued until about 6:30 in the morning when defendant was placed in the basement lockup at the station where he remained until about noon. He was then removed to Central Police Headquarters at 11th and State streets by two officers, and taken to the crime laboratory where he underwent a polygraph examination for two hours. Thereafter he was interrogated by officers Flanagan, Flood, Barrett, Banks, and Jones at the homicide division until five or six o'clock when he was returned to the Warren Avenue station. The interrogation by Lt. Flynn and officers Pates,

Vincent, Jones, and Slaughter was then resumed and some time between 9:30 and 11:00 o'clock on the evening of November 25 the defendant agreed to make a statement to an assistant State's Attorney.

Assistant State's Attorney Eldred Benz arrived at the station about 11:00 P.M. on the evening of November 25. After being briefed by Lt. Flynn, Benz discussed with the defendant the matters to be covered in the statement, and a question and answer statement was then taken in the presence of Lt. Flynn and court reporter Smith; the defendant subsequently refused to sign the transcribed statement. Officer Pates's signature appears as a witness on a stenographic transcript of the confession although Benz, Smith and Flynn all testified there was no one present with the defendant at the time the statement in question was taken except the three of them. Pates denied being present during the interrogation by Benz, and although he identified his signature, he could not remember how or when he signed it.

November 26, 1959, was Thanksgiving Day, and on Friday, November 27, the defendant was taken before a municipal court judge for preliminary hearing. His present counsel was appointed to represent him on January 15, 1960.

Meriting primary consideration is defendant's contention that the methods used to secure the confession were violative of defendant's constitutional rights under both the State and Federal constitutions and that his motion to suppress the confession, the hearing on which lasted a full week, should have been allowed. Defendant testified to physical abuse by the officers which, if believed, would invalidate his subsequent admissions. His argument regarding prolonged interrogation, denial of counsel, denial of prompt arraignment, and claim of corroboration as to his testimony regarding violence must all be weighed with respect to the rules of law heretofore announced. The physical abuse testified to by defendant consisted of claims that he

was struck with a blackjack, beaten on top of the head with a city of Chicago telephone book, that the telephone book was placed on his head and then struck sharply and repeatedly with a baseball bat; and that his clothing was removed and he was forced to lie on the floor with his legs separated while the officers struck him on the testicles with a belt. Additionally, he claimed the officers pulled on his handcuffed arms so as to cause him considerable pain. Corroboration exists, defendant argues, for this testimony in the statements of the county physician that the doctor found welts on defendant's wrists from the handcuffs and that, while the physician had seen them on prisoners before, they were "quite unusual." Defendant's brother and mother testified defendant told them of his mistreatment and that his confession was untrue when they were first permitted to see him. Contrasted to this are the undenied facts that defendant did not tell the committing magistrate, county physician or assistant State's Attorney of the alleged mistreatment, the fact that the welts on defendant's wrists could well have resulted from causes other than the claimed abuse, and the unequivocal denial of this mistreatment by each of the persons supposed to have participated in or witnessed it.

The prolonged interrogation relied on by defendant as error consisted, according to defendant, of questioning by various officers from the time of his arrival at the Warren Avenue station at about 11:00 P.M., November 24, to 6:30 or 7:00 A.M., November 25, a period of rest until noon of the same day when intermittent questioning resumed, culminating in the confession at 8:00 or 9:00 P.M. It is apparent that the entire period covered no more than 24 hours, during a portion of which defendant was asleep or resting.

Argument relating to the denial of a prompt arraignment is predicated on the fact that defendant was taken into custody shortly before 11:00 P.M. on November 24. The following day he was taken to Central Police Headquarters in Chicago at 11th and State streets, a building in which

four branches of the municipal court were then in session, and before any one of which defendant might well have then been taken for a preliminary hearing. The purpose of the visit there was to enable defendant to take an agreed lie-detector test, following which he was returned to the Warren Avenue station where his confession occurred that evening. The following day being Thanksgiving the defendant's preliminary hearing did not occur until November 27, the day after Thanksgiving.

The proof as to the denial of counsel is unclear in that the defendant apparently did not request that he be permitted to call a lawyer or that a specific lawyer be called for him. While the defendant did testify as to the names of two specific lawyers in his trial testimony, there was no such evidence at the hearing on the motion to suppress the confession. The proof in support of the motion was simply that "defendant said he would not make a statement without his lawyer"; that he "did not know who his lawyer was, but he would get one."

We have repeatedly held all of the foregoing factors to be properly considered, whether it be for the purpose of the trial court's initial determination of admissibility, or the subsequent evaluation by judge or jury of the probative value to be accorded the confession. Specific decisions have affirmed admissibility of confessions obtained during periods of detention substantially exceeding that which here preceded the confession. (*People* v. *Reader,* 26 Ill.2d 210; *People* v. *DeSimone,* 27 Ill.2d 406.) Undisputed and repeated denial of counsel's request to see his client prior to the making of a confession has been held not to vitiate a confession. *People* v. *Escobedo,* 28 Ill.2d 41, (No. 36707); *Crooker* v. *California,* 357 U.S. 433, 2 L. ed. 2d 1448, 78 Sup. Ct. 1287; *Cicenia* v. *LaGay,* 357 U.S. 504, 2 L. ed. 2d 1523, 78 S. Ct. 1297.

In determining admissibility of a confession "The ultimate test remains that which has been the only clearly estab-

lished test in Anglo-American courts for two hundred years: the test of voluntariness," (Frankfurter, J. in *Culombe* v. *Connecticut,* 367 U.S. 568, at 602, 6 L. ed. 2d 1037, 81 S. Ct. 1860,) made without reference to the probable truth or falsity thereof. (*Rogers* v. *Richmond,* 365 U.S. 534, 5 L. ed. 2d 760.) Adhering to this standard, we pointed out in *People* v. *Nemke,* 23 Ill.2d 591, at 600: "The basic inquiry is whether or not the confessions in question were voluntary. The determination of this question depends not upon any one factor, but on the totality of all the relevant circumstances. Thus, the scope of inquiry at the preliminary hearing must be sufficiently broad to place before the trial judge all of the relevant circumstances surrounding the taking of the confession and bearing upon the question of voluntariness. The precise scope of the preliminary hearing necessary to determine whether or not a confession is voluntary will depend somewhat upon the circumstances of each case."

We have consistently held that upon preliminary inquiry into the voluntary nature of a confession, the question of its competency is for the trial court and that in making its decision the trial court is not required to be convinced of its voluntary nature beyond a reasonable doubt. (*People* v. *Nemke,* 23 Ill.2d 591, 601; *People* v. *Sims,* 21 Ill.2d 425.) A careful review of this record discloses that the hearing on the motion to suppress occupied five full days. Counsel presented supporting testimony and argued there every point before us here. The question and answer statement here involved is 39 pages in length; 45 minutes were required for the prosecutor to read it to the jury. It is not a series of "yes" and "no" answers to leading questions—it consists, rather, of narrative answers, frequently of substantial length, and clearly reveals a reasonably intelligent individual in full possession of his faculties, aware of his right to refuse to incriminate himself, of his right to counsel and his right to refuse to sign the statement. It definitely

does not depict an individual whose will at that time had been psychologically overborne, whose intellect was other than rational, or whose intelligence was other than normal. The judge hearing the motion chose to believe the prosecution witnesses, and denied the motion to suppress. There is nothing in this record which would justify us in disturbing his finding.

The adequacy of the findings of a trial court was discussed by the United States Supreme Court in *Townsend* v. *Sain,* 372 U.S. 293, 9 L. ed. 2d 770, 83 S. Ct. 745, in determining the necessity of a plenary hearing in Federal district courts of *habeas corpus* applications based upon alleged constitutional violations in State criminal proceedings. The court there held necessary an evidentiary hearing for a *habeas* applicant in a Federal court unless it is apparent from the express findings of the State trial court that the merits of the factual dispute were resolved by a full and fair hearing at which the material facts were adequately developed and where the record as a whole supports the findings. The desirability of express findings is further indicated by the court's opinion that the presence or absence of the foregoing factors can most readily be ascertained from the findings upon which the decisions are predicated.

Before considering the allegations of trial error, it should be noted that the judge who presided at the hearings on the motion to suppress the confession and other preliminary motions had been reassigned to a court other than the criminal court when this case came on for trial; therefore a different judge presided at the trial, and it was stipulated that the rulings of the judge who had heard the motions should stand as the rulings of the trial judge when the same questions arose on the trial.

We are now confronted with complaints as to a number of alleged trial errors, the first of which relates to the *voir dire* examination of the jury which had been left to counsel. After four jurors had been selected and sworn to try

the issues, the assistant prosecutor ascertained that a prospective juror opposed the imposition of the death penalty in any case. After this juror had been excused for cause, the assistant prosecutor apparently addressed the entire venire indicating that, if any of them felt the same way, they should speak up. A number of prospective jurors did so. The court then intervened, telling the jurors if they opposed "execution" they should have said so earlier, and stating: "Now, you know you owe a duty now to your city and to your community generally to act as jurors. Now you are doing this but you are telling us at this time that suddenly you have felt that you feel that you are going to be influenced?" A lengthy discussion ensued between court and counsel in the jury's presence regarding the propriety of the court's comments and questions, and this culminated in a motion by defendant for a mistrial, followed by defendant's request that further argument be outside the jury's presence.

While a complete portrayal of the situation would require a verbatim inclusion of some 26 pages of the record containing the comments of the court, counsel and jurors, and unreasonably extend this opinion, it is apparent that the proceedings at that time were quite irregular, being characterized by the judge as an "uproar". Following an off-the-record conference the trial judge announced that he was going to grant the motion for a mistrial. There then occurred another off-the-record conference at the conclusion of which the court announced a luncheon recess. Upon reconvening, the motion for a mistrial was denied without any statement as to the reason for the reversal of the ruling.

In our opinion it is impossible accurately to assess the effect of the irregular and extended discussion of the death penalty in the presence of the jury, particularly when coupled with an expression of the court's displeasure that the jurors had not expressed themselves earlier. In this case the jury imposed the death penalty, and we believe it cannot be said with certainty that no juror could have been influ-

enced to the prejudice of defendant by the occurrence in question. While the motion for a mistrial was addressed to the sound discretion of the judge, we believe he should have followed his first inclination and allowed it. *People* v. *Adams,* 25 Ill.2d 568; *People* v. *Winchester,* 352 Ill. 237.

Secondly, defendant argues that his right to cross-examination was unreasonably restricted on several occasions, one of which occurred during the testimony of police lieutenant Flynn at the hearing on the motion to suppress. The officer did not use any written memoranda to refresh his recollection while on the stand or in the courtroom, but did state on cross-examination that the preceding evening, and earlier that morning, he had gone over a "captain's report" and a statement taken by him from one Diverna Day with whom defendant originally claimed to have spent the night on which the murders occurred. These documents were under subpoena and in the courtroom at the time. It is unclear as to precisely what portions of the captain's report represent Flynn's personal notes, and no representation was made by defendant's counsel that the officer's testimony differed from the contents of the statements. A slightly different situation arose when officer Banks testified. The only memoranda shown to exist here, access to which was denied defense counsel, was a report consisting of a joint summary of the entire case made by this witness and another officer to their captain. It was not established and it is not argued that officer Banks had used this document to refresh his recollection prior to testifying. The written summary made by Banks was, however, examined by the judge who then stated: "I see nothing in the statement which is inconsistent with the testimony which the witness has given on the stand." The judge further stated that the three-page report had in it only three sentences which dealt with the facts testified to by this witness, and these three sentences indicated just what the witness had stated. Defendant requested production of all of these documents for his examination

and use for possible impeachment purposes. This was denied, and defendant now complains of the court's ruling with respect to the "captain's report" referred to by Flynn and the summary made by Banks, the Day statement having been admitted subsequently.

Two questions are here presented, the first arising wholly apart from *People* v. *Moses,* 11 Ill.2d 84, and *People* v. *Wolff,* 19 Ill.2d 318, and the second stemming from our holdings in those cases. Only the latter is involved in Banks testimony, but the Flynn situation embraces both. As to the documents referred to by Flynn, defendant first contends he is entitled to examine any documents used by a witness to refresh his recollection irrespective of whether the reference to the document occurs during the trial or prior thereto. Additionally, defendant claims access to all of the documents under the *Moses* rule as clarified in *Wolff.* The expressions of this court in *Moses* and *Wolff* leave no room for the argument made by the assistant State's Attorney at the trial that a prior showing of inconsistency is a necessary preliminary to defense access to recorded statements of a prosecution witness made before trial once the existence and relevancy of these statements has been established. Any notion that such a showing was required under *Moses* was subsequently dispelled by our statement in *Wolff* (p. 324) that: "While some of the cited decisions, and others, contain language which suggests that the foundation evidence must likewise establish that the statement or report made by the witness is contradictory to his testimony at the trial, that concept has been discarded in later cases as being manifestly unfair, (since contradiction can hardly be determined until the statement is produced,) and the better view, to which we subscribe, is that 'For production purposes, it need only appear that the evidence is relevant, competent, and outside of any exclusionary rule'." And at page 327 the following statement, which we hereby affirm, appears: "However, if the prosecution claims that any document ordered

to be produced contains matter which does not relate to the testimony of the witness sought to be impeached, the trial judge will inspect the document and may, at his discretion, delete unrelated matters before delivery is made to the accused."

It is thus apparent that, had the summary dealt only with the substance of officer Banks's testimony, defense counsel would have been entitled to its delivery directly to him. Since, however, the People claimed the document contained matter unrelated to the witness's testimony, the judge properly directed its delivery to him for his inspection to determine its materiality. Examination revealed that only three sentences in the three-page report dealt with the matter testified to by the witness. A strict construction of *Wolff* would result in all of the report being deleted except the three pertinent sentences, or the reproduction of the relevant sentences, and delivery thereof to the defendant. However, since the sentences here involved dealt only with the transportation of the defendant to the crime laboratory and thence to the homicide bureau, and this was so stated by the judge, we can conceive of no prejudice to the defendant resulting from his failure to secure the three sentences in their identical form, and hold the action to have been a reasonable exercise of the judge's discretion.

The problem involved with officer Flynn's testimony is not so easily resolved. The People contend that *Moses* and *Wolff* require production only of statements or documents in the words of the witness being examined, and, therefore, are inapplicable here because there is no proof that the material referred to here was in Flynn's own words. We agree that the People have correctly interpreted our opinions, but we find the record does show preparation by the witness of at least some of the refreshing material. The relevant testimony follows:

"Q. Lieutenant, before testifying here today, did you go back through any of *your reports or writings* or any-

thing like that to refresh your recollection as to the events that transpired on the day of November 25, 1959? [Emphasis supplied.]

A. Yes, sir, I did."

And, again:

"Q. Lieutenant, in addition to the statement of Miss Day to which you have referred, were there any other writings or memoranda that you read or refer [sic] to for the purpose of refreshing your recollection?

A. A copy of the Captain's report."

*It is thus apparent that the only proof in the record as to* this does indicate that some portion, at least, of the refreshing material was prepared by the witness in his own words and was available to defendant under our prior decisions.

Counsel have briefed the other aspect of this question as to whether refreshing material referred to by a witness before trial outside the courtroom must be exhibited to opposing counsel on demand. Since the question is here raised, and there appears no decisive ruling in this State, we have considered it. Had reference been made by the officer to the captain's report during his testimony for purposes of refreshing his recollection, we assume no question could be raised as to the necessity for its exhibition to defense counsel for his examination and use during cross-examination. We see no substantial or logical difference between that situation, and the one where the witness examines the refreshing document prior to stepping into the courtroom. The opportunity for mischief or error is equally present regardless of where or when the inspection of the documents occurs. As Wigmore states: "For though there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great." (3 Wigmore on Evidence, 3rd ed., sec. 762, p. 111.) Since officer Flynn was one of the State's principal witnesses, and it is possible that examination of the report by defendant would have revealed some discrepancy or affected the man-

ner or scope of cross-examination, which in turn might conceivably affect the verdict or punishment involved, we cannot hold the error harmless as we are urged to do. *People* v. *Adams,* 25 Ill.2d 568; *People* v. *Winchester,* 352 Ill. 237.

Defendant next urges error in the failure of the trial court to advise the jury that People's exhibit No. 3, a large wrench found at the scene, had been excluded from evidence and that the jury should disregard all testimony relating to it. This exhibit had been marked for identification during the direct examination of Dr. Joseph E. Campbell, chief forensic pathologist for the Cook County coroner, who examined the bodies of decedents on November 17, 1959. The doctor testified that the wrench could have produced all of the injuries to Schot except the cut on his neck, and further testified the wrench could have produced the injuries to Mrs. Rhinehardt, but thought it was more probable her injuries were caused by blows from fists rather than a blunt instrument such as the wrench. Officer Ziegenhorn, who arrived at the building about 3:00 A.M. on November 17, identified the wrench as being found on the bed beside Mrs. Rhinehardt's body. The officer further identified People's exhibit No. 4 which he testified was a knife which he found in the basement of the building on a mantel near the body of John Schot. Both items were examined in the Chicago police crime laboratory, and officer Vitullo testified to the presence of blood on the knife and "very minute portions of hair" on the wrench. It could not be determined whether the blood was human blood nor whether the hair was human hair. There was no testimony connecting the wrench or the knife with the defendant, but the defendant in his confession referred to a large metal object with which "his partner" had struck John Schot, and to a knife which "his partner" had used.

Defendant objected to the introduction of both of these exhibits and the trial court sustained the objection as to exhibit No. 3, the wrench, and overruled it as to exhibit No.

4, allowing the knife to be admitted. Out of the presence of the jury, defendant's counsel requested the trial court to advise the jury that the wrench had not been admitted into evidence and to disregard any testimony regarding it. The court refused to grant this motion and refused to so instruct the jury. The defendant now contends that reversible error was committed in the court's failure to instruct the jury to disregard all testimony relating to the wrench which had been in the courtroom during most of the trial. No question is raised as to the ruling of the court with reference to the knife.

We believe the error committed by the court lay in sustaining the objection to the admissibility of the wrench. The wrench had been identified as having been found laying on the bed near the body of Gertrude Rhinehardt; the testimony of the pathologist was that the blows and the major portion of the injuries to both decedents could have been inflicted by the wrench, although the doctor thought it more likely that the injuries to Mrs. Rhinehardt had been occasioned by the use of fists. The argument of the defendant that the wrench must first be connected with the defendant before it may be admitted into evidence confuses the distinction between the admissibility of evidence and its probative value. As Wigmore puts it, in volume 1 of his 3rd edition at page 411: "The rule of law which the judge employs is concerned merely with admitting the fact through the evidentiary portal. The judge thus warns the opponent of the evidence that he is not entitled to complain of its lack of absolute demonstrative power; a mere capacity to help in demonstration is enough for its admission." And at page 412 the following: "The required probative value * * * is far lower than full proof, because the judge merely puts upon the material its ticket of admission as relevant, and leaves the weight, or final persuasive effect, for the jury to determine." The defendant is entitled to argue to the jury the lack of any connection between the wrench and the de-

fendant, or the lack of proof that the defendant owned or used the wrench; he may point out the weakness of its probative value, but he cannot bar its admission.

We have examined the cases cited by defendant and find them inapposite in that they are authority only for the proposition that the court should instruct the jury to disregard stricken evidence or that to which objections have been sustained; they are not in point as to the exclusion or admissibility of the wrench. We therefore conclude that the facts that two of the indictments charged the use of a wrench, and the medical testimony that the injuries could have been caused by it, coupled with the proof of its presence on the decedent's bed, are sufficient to render it admissible. The error lay in its exclusion, and this could not possibly prejudice defendant.

Defendant complains of the giving of People's instructions Nos 7 and 9 which dealt with the subject of malice. Instruction No. 7 is: "The court instructs the jury, in the language of the statute, that murder is the unlawful killing of a human being, in the peace of the people, with malice aforethought, either expressed or implied. The unlawful killing may be perpetrated by beating, or by any other of the various forms or means by which human nature may be overcome, and death thereby occasioned. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned or malignant heart."

Instruction No. 9 was as follows: "The court instructs the jury, as a matter of law, that malice is not confined to ill-will towards an individual, but is intended to denote an action flowing from any wicked and corrupt motive—a thing done with a wicked mind, when the act has been attended with such circumstances as evince plain indications

of a heart regardless of social duty and fatally bent on mischief. Hence, malice is implied from any deliberate or cruel act against another, however sudden, which shows an abandoned and malignant heart; and if the jury find from the evidence, beyond a reasonable doubt, that the defendant in this case committed a deliberate and cruel assault upon the deceased, John Schot or Gertrude Rhinehardt, however sudden, which showed an abandoned and malignant heart, then the jury would be warranted in finding that he committed such an assault with malice, within the meaning of the law."

It is true that in *People* v. *Corbishly,* 327 Ill. 312, we condemned the giving of abstract propositions of law as instructions to a jury, and there said at page 338: "The vice of giving abstract propositions of law as instructions to a jury is, that the jury are too liable to arrive at the conclusion that the court thinks that the facts stated in such an instruction on which the proposition of law is based have been proved, while the law is that the jury should be required to make the proper finding on such facts." While instruction No. 7 is an abstract statement, it was one of a series to be considered with all others. It deals with express and implied malice in the words of the statute, while instruction No. 9 defines and explains implied malice. When considered as part of a series neither is inflammatory or repetitious, and both were properly given. *People* v. *Gibson,* 385 Ill. 371, 376.

Other errors alleged to have happened are not likely to reoccur, and we therefore do not discuss them. While defendant argues at length the presence of a constitutional violation in permitting the jury to determine the punishment, we need not consider this problem since this aspect of the retrial will be governed by the provisions of the 1961 Criminal Code which differ substantially. Ill. Rev. Stat. 1961, chap. 38, par. 1—7(b); *People* v. *Johnson,* 23 Ill.2d 465.

Since, in our opinion, the errors occurring in the trial of this cause could have influenced the verdict or punishment imposed, the judgment of the criminal court of Cook County must be and is hereby reversed, and this cause is remanded for a new trial.

*Reversed and remanded.*