(No. 52775.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JAMES P. FREE, Jr., Appellant.

*Opinion filed January 24, 1983.—Rehearing
denied April 8, 1983.*

CLARK and SIMON, JJ., concurring in part and dissenting in part.

Mary Robinson and G. Joseph Weller, Deputy Defenders, and Paul J. Glaser and Kyle Wesendorf, Assistant Defenders, of the Office of the State Appellate Defender, of Elgin, of counsel, for appellant.

J. Michael Fitzsimmons, State's Attorney, and Thomas L. Knight, both of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and Daniel E. May, law student, of counsel), for the People.

CHIEF JUSTICE RYAN delivered the opinion of the court:

James Free was indicted in the circuit court of Du Page County for the murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) and attempted rape of Bonnie Serpico (Ill. Rev. Stat. 1977, ch. 38, par. 8—4) and for the attempted murder and attempted rape of Lori Rowe. At the conclusion of the trial, the jury returned verdicts of guilty on all counts. The prosecutor requested a hearing to determine whether the death penalty should be imposed. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) The jury found unanimously beyond a reasonable doubt that the victim was murdered in the course of a burglary and a rape, both of which are aggravating factors supporting the imposition of the death penalty. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)(c).) The jury also found no mitigating

factors existed to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(c), (g).) The trial judge entered judgment sentencing the defendant to death. The defendant was also sentenced on the other counts of attempted murder and attempted rape. The death sentence was stayed (73 Ill. 2d R. 609(a)), pending direct appeal to this court, pursuant to Rule 603 (73 Ill. 2d R. 603). For the reasons expressed in this opinion, we affirm the convictions and the sentences.

The circumstances of the crimes were testified to by Lori Rowe. The defendant testified but claimed not to have any actual recollection of the circumstances surrounding his criminal acts.

Lori Rowe began work shortly before midnight on April 24, 1978, at the M-2 Service Center, an all-night keypunch business. It is located in a large office complex known as the Glen Hill Office Complex in Glen Ellyn, Illinois. Shortly before 4 a.m., while Lori Rowe was sitting at her desk, she saw a stranger, later identified by her as the defendant, standing just inside the door. Bonnie Serpico, the only other employee present, was in a back room. The defendant held a gun in his left hand and a cloth bag in the other.

As Lori Rowe approached the defendant, Bonnie Serpico came out of the back room. The defendant ordered both women into the back room. He forced them, at gunpoint, into the lunchroom and ordered them to lie down on their stomachs, which they eventually did.

The women asked him what he was there for and if he wanted their money. The defendant stated that he did not want their money, but that they should take off their clothes because he wanted to rape them. Rowe started to cry, and Serpico tried to persuade the defendant to take their money and leave the office. The defendant again stated that he did not want their money and turned toward Rowe, telling her to remove her clothes.

Serpico continued trying to reason with the defendant, but he stated, "I've done this before." As he made that statement, he moved toward Rowe and took some twine out of the cloth bag he was carrying. He told her to put her hands behind her back.

After securely tying Rowe, the defendant took Serpico into the other room. As they were going into the other room, Serpico looked in his bag and commented, "You came prepared for this." The defendant replied, "Yes, I've all sorts of stuff in there."

After Serpico and the defendant went into the next room, Rowe began struggling to get loose. She heard Serpico say that she had her clothes off and the defendant responded, "Get on your stomach, put your hands behind your back. I want to tie your hands." Serpico urged the defendant not to tie her hands, pointing out that she had not resisted the defendant.

In the meantime, Rowe managed to get her shoes off and was attempting to get the rope off her feet. The defendant came into the room to check on Rowe, and he saw that Rowe had loosened the rope. He became angry and yanked the rope, pulling her sideways until she fell onto her side.

While lying on her side, Rowe heard Serpico get up and run. The defendant started running after her. Seconds later Rowe heard a gunshot. The defendant then ran back into the room where Rowe was lying. Rowe was sitting up now and the defendant pointed his gun at her and she cried, "Oh no." As she lowered her shoulder and turned away from the defendant, he shot her and ran from the building.

With her hands still tied behind her back, Rowe managed to crawl out to the main office area where Serpico lay dead. Rowe was able to pull the telephone off a desk and contact the police. She remained there until the police arrived about 15 minutes later.

An autopsy revealed that the cause of Serpico's death was exsanguination, or severe loss of blood, related to a gunshot wound.

Through a police investigation, suspicion focused on the defendant, who was arrested early the next morning, April 25, 1978, in a house owned by his father in Dubuque, Iowa. He was charged with one count of murder and attempted rape against Bonnie Serpico and one count of attempted murder and attempted rape against Lori Rowe.

The jury found the defendant guilty on all counts. At a sentencing hearing on the murder conviction, as noted, the jury found that Bonnie Serpico was killed in the course of a rape and a burglary and that no mitigating factors existed sufficient to preclude imposition of the death sentence. The trial judge entered a judgment sentencing the defendant to death. At a later sentencing hearing, on the other convictions, the court sentenced the defendant to serve two concurrent 15-year prison terms for the two counts of attempted rape and a consecutive 30-year sentence for the attempted murder.

The defendant has raised some 16 issues to be resolved on this appeal. Other facts relevant to their resolution will be set forth with the discussion of each particular issue. Several issues raised in this case have been resolved in prior opinions of this court and will not be further discussed in this opinion. The defendant challenges the constitutionality of our death penalty statute, which was resolved in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. The defendant argues that our statute does not include attempt (here, attempted rape) in the list of aggravating factors which trigger eligibility for the death penalty. That issue was resolved against the defendant in *People v. Walker* (1982), 91 Ill. 2d 502. Defendant argues that the trial court erred when it held it has no power or discretion to disregard a jury's ver-

dict in a death penalty proceeding and must enter judgment on that verdict. That was resolved, contrary to defendant's position, in *People v. Lewis* (1981), 88 Ill. 2d 129, and *People v. Gaines* (1981), 88 Ill. 2d 342. Also previously rejected were the contentions that the appellate review procedure provided by our statute is inadequate (*People v. Brownell* (1980), 79 Ill. 2d 508, 541-44; *People v. Gaines* (1981), 88 Ill. 2d 342, 383; *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47), and that defendants sentenced to death are denied relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1977, ch. 38, par. 122—1 *et seq.*), in violation of their constitutional rights. *People v. Gaines* (1981), 88 Ill. 2d 342, 384-86.

As to the issues to be decided in this case, we first consider whether a motion to suppress certain physical evidence should have been granted.

Through police investigation it was learned that the alleged assailant was James Free, a former employee of the Glen Hill Office Complex. On Sunday, April 23, 1978, another incident involving the defendant occurred. It was reported by several women working at the office complex that a man, later identified by them as the defendant, came into their office. The women questioned him, and he said that he had come to clean the carpet. He walked through the office and then left.

Two of the women, Julie Kelly and Mary Ferrier, went down to the basement to a vending machine. They saw the defendant walk past the doorway. When they went back into the hallway, they observed him staring at them through a window. They ran back to their office and later received a phone call from a person with a male voice. The caller described the women who had been in the basement and stated that they had left change in the vending machine. He suggested they come down to get their change. The women knew they had not left any change and refused to go down to the base-

ment. They then saw the defendant riding around the parking lot of the office complex in a red Ford pickup truck.

The police talked with the manager of the Glen Hill Office Complex, and he stated that the description of the offender and the vehicle driven by the offender matched that of James Free, a former employee of the construction company that built the complex and of the complex itself. He was later identified in a photo lineup by Lori Rowe as her assailant. Further information led the police to believe that the defendant was residing at his parents' townhouse in Dubuque, Iowa, on leave for 30 days from the army.

On April 25, 1978, Detective Velon and two other Glen Ellyn, Illinois, police officers accompanied Iowa officers to the Free townhouse in Dubuque. The police had an arrest warrant for James Free for murder and attempted murder. Emergency equipment, including fire equipment and an ambulance, were stationed in the vicinity.

The police officers, using a public address system, made repeated attempts to call the defendant from the house for about 30 minutes. After that time, and after seeing someone at both the front and back windows, a tear gas canister was fired into the second-floor window. The defendant came out of the house and was ordered to lie on the ground with his hands out in front of him. Other officers were ordered to watch the house in the event that someone else was still in there. While lying on the ground, the defendant was handcuffed.

The defendant, at this time, was asked where his gun was and whether anyone was in the house. He replied that his gun was in the basement and that no one was in the house. No other questions were asked of the defendant. The defendant was then taken to the Dubuque police department. Only a short period of time elapsed be-

tween the time the defendant came out of the house and the time he was placed in the squad car. No threats were made, and no physical contact ensued, although it is indicated that officers had guns pointed at him during this period.

After the defendant was in custody, several officers attempted to enter the house. Captain Egan of the Dubuque police department entered and proceeded to the second floor "to make certain there was no one else present in the building and to make certain that the tear gas projectile did not hit someone or start a fire." On his first two entries, Captain Egan was forced out of the house by the tear gas. On his third trip to the second floor, Egan retrieved the tear gas canister.

Officer Kisting and Detective Velon attempted to check the first-floor area to determine if anyone else was present in the building. During this entry, Velon observed brown twine "in a garbage bag, on the very top of that bag, fully exposed ***." He testified that the twine was similar to the twine that he knew had been used to tie the hands of Lori Rowe. He also testified that he was not looking for the twine when he entered the premises and did not seize the twine during this search.

Officer Kisting and Detective Velon also went to the basement. Their search of the first floor and the basement lasted about 45 seconds. Captain Egan testified that all three of his attempts to search the second floor lasted about two minutes.

All three officers testified that they did not look into any drawers, cabinets or closets during their search. The only item seized was the tear gas canister, which had left a scorch mark on the floor of the bedroom where it landed.

The officers left the scene and obtained a search warrant through an Iowa magistrate. They returned to

search the house and seized a gun, boxes of ammunition, clothing, the brown twine, a gym bag, reloading equipment, plastic earmuffs, and a towel. Photographs were also taken of the scene.

The defendant filed a motion to suppress the physical evidence because the granting of the search warrant was based upon the defendant's involuntary statement made following his arrest and information gained during allegedly unlawful entries into the house after he was arrested. The defendant also filed several motions to suppress certain statements, which motions are not before us on this appeal.

The trial court denied the motion to suppress the physical evidence after a lengthy evidentiary hearing. The court found that the entries into the house were not unlawful searches and that the statement made by the defendant that his gun was in the basement at the time of his arrest was involuntary, but not in violation of his *Miranda* rights. The court held that although the statement could not be used as evidence, it was properly used in the affidavit for a search warrant. The court also found that even excluding the "gun statement" and information gained in the prior entries and searches of the house, the affidavit and oral testimony given to the issuing magistrate constituted probable cause for the issuance of the warrant.

On appeal, the defendant again argues that the search warrant was invalid because it was based on information gathered at an allegedly prior illegal entry and on the allegedly involuntary statement made by the defendant. He also argues that because the warrant is invalid, all the evidence seized pursuant to the warrant must be suppressed.

We hold that the prior entries into the house were reasonable, necessary and cursory searches under the exigencies of defendant's arrest. The entries were also

justified as valid "protective sweeps." While lawfully on the premises, Detective Velon observed the twine which was in plain view. This information was therefore properly included in the search warrant affidavit and relied upon by the magistrate. The information concerning the twine, plus other information presented to the magistrate, all of which will be discussed later, established probable cause to issue the warrant, even without consideration of the defendant's allegedly involuntary statement. Therefore, we need not decide whether the statement could properly be considered in support of the search warrant.

The guiding principle is reasonableness in fourth amendment searches and seizures. (*United States v. Chadwick* (1977), 433 U.S. 1, 9, 53 L. Ed. 2d 538, 547, 97 S. Ct. 2476, 2482.) In determining whether law-enforcement officials acted reasonably in a given case, courts should judge the circumstances as known to the officials at the time they acted. (*People v. Clay* (1973), 55 Ill. 2d 501, 504.) It must be remembered "that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." (*Michigan v. Tyler* (1978), 436 U.S. 499, 509, 56 L. Ed. 2d 486, 498, 98 S. Ct. 1942, 1949.) Warrantless searches are permissible where exigent circumstances are present. Since exigent circumstances authorize warrantless entries for purposes of searching, certainly circumstances may exist which authorize warrantless entries for less intrusive purposes.

We believe that circumstances existed here which justified the warrantless entry into the house. In fact, the police had an obligation to enter the premises, retrieve the tear gas canister, air out the house, check for fire, and determine whether there were persons present who either were in danger or posed a substantial danger to the police. (See 2 W. LaFave, Search and Seizure secs.

6.4(c), 6.6 (1978).) In *People v. Connolly* (1973), 55 Ill. 2d 421, the police surrounded a two-story building, and efforts to persuade the defendant to surrender had failed. Tear gas canisters were fired into the building, and a fire started on the second floor. Defendant was arrested as he descended the stairs from the second floor. A fireman entered the building and was overcome by smoke. A police officer then entered the apartment attempting to assist the fireman, "as well as attempting to locate other persons possibly still in the gas-filled house." (*People v. Connolly* (1973), 55 Ill. 2d 421, 427.) The officer observed a fur coat and two revolvers on top of a garbage can. He seized the evidence.

The court in *Connolly* held that the trial court properly denied the defendant's motion to suppress. The court stated that the officer was in the building to help a fireman, as well as to ascertain if any persons were in the building. The items seized were known by the officer to be similar to those used in the commission of a crime, and they were in plain view. *People v. Connolly* (1973), 55 Ill. 2d 421, 427.

A substantially similar situation existed in our case. The officers entered the house to make certain there was no one in the house who was either a danger to the police or in danger himself. Also, the officers were concerned about the fire hazard presented by the tear gas canister, which did, in fact, scorch the floor. It was not necessary to wait until a fire started before the officers could enter to retrieve the tear gas canister as the defendant would apparently require.

The entry and search to determine if anyone is in the house who may pose a danger to the police is often referred to as a "protective sweep." Professor LaFave states:

> "In some situations, the 'potentiality for danger surrounding the arrest' may be so high that entry of premises to make a 'protective sweep' will be permissible even

though the arrest itself was achieved without entry. Typically, the reason no entry was made to arrest is because the police perceived the situation as a very dangerous one and thus took steps to cause the prospective arrestee to exit the premises and submit to arrest outside. Even with that person now in custody, the police may have good reason to doubt whether they can withdraw from the area with their prisoner without being fired upon, in which case an entry and 'protective sweep' is justified. Such entries have been upheld when a weapon used in a recent crime by the arrestee or a weapon used by someone in firing at the police from those premises is as yet unaccounted for, and also when police have information the defendant was travelling with armed associates or that the defendant was armed and accompanied by another." 2 W. LaFave sec. 6.4(c), at 431 (1978).

The officers' entry into the house falls within the above rule. The officers knew that defendant had used a gun in the commission of the crimes. His brother-in-law had told the police that the defendant carried a handgun in his truck. When the defendant was captured, he did not have the gun. Although there was no evidence that the defendant had an accomplice in the commission of the crimes, one officer testified that he saw someone at both the front and back windows of the house before the defendant came out, and he could not be sure if both were the same person. Thus, the officers had knowledge that a violent crime had been committed, that the gun used had not been recovered, and that someone was possibly in the house who would have access to the weapon. There was a potentiality for danger surrounding the arrest which justified the "protective sweep" of the house. (See *McGeehan v. Wainwright* (5th Cir. 1976), 526 F.2d 397.) A serious and demonstrable potential for danger clearly existed here. (See *United States v. Kinney* (6th Cir. 1981), 638 F.2d 941; *United States v. Smith* (5th Cir. 1975), 515 F.2d 1028, 1031.) The officers did not enter the house for the purpose of conducting a search except for the limited purposes indicated.

Only this limited search was made while in the house, and nothing except the tear gas canister was seized. Even the brown twine, which one officer observed while in the house, was not taken, although it resembled twine which had been used to bind the victims.

At the hearing on the motion to suppress, the trial court was shown a videotape of the entire arrest scene. Although defendant argues that the videotape demonstrates that the officers did not feel that they were in danger, the court was of the opinion that the videotape and other evidence showed that an exigency existed. The court stated, "Having viewed the videotape and having considered the testimony in my opinion there was a sufficient exigency to have warranted these entrances by the officers." The trial court found that the entrances were reasonable for the reasons stated by the officers and justified under the exigencies of the arrest. Detective Velon was properly in the house, and his observation of the twine in plain view was properly used in the affidavit for the search warrant. See *People v. Connolly* (1973), 55 Ill. 2d 421, 427; *People v. Bombacino* (1972), 51 Ill. 2d 17.

The defendant also argues that to find probable cause the Iowa magistrate relied on Detective Velon's observation of the twine made during an illegal search and the defendant's involuntary statement made at the time of his arrest and that, therefore, the warrant was invalid. The defendant argues that any unlawfully obtained information used to secure a search warrant invalidates that warrant and the subsequent search is a fruit of the poisonous tree, even if probable cause can be found without the illegal information.

As we have already stated, Detective Velon's entry into the house was legal, and his observation of the twine in plain view was properly included in the affidavit for the search warrant. The only remaining allegedly unlawfully obtained information used to secure the search warrant

was the statement made by the defendant at the time of his arrest, which the trial court, while suppressing its use as evidence, permitted to be used in the affidavit for the search warrant. We need not decide whether it was properly included in the affidavit for "[i]f the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant, apart from the tainted information, the evidence seized pursuant to the warrant is admitted." *James v. United States* (D.C. Cir. 1969), 418 F.2d 1150, 1152; *United States v. Marchand* (2d Cir. 1977), 564 F.2d 983, 1002; *United States v. Koonce* (8th Cir. 1973), 485 F.2d 374, 379; see also 3 W. LaFave, Search and Seizure sec. 11.4(f), at 649-50 (1978).

The magistrate who issued the warrant had before him the affidavits of two police officers and the oral testimony of one of the officers. He was informed that the officers had an arrest warrant for defendant which indicated there was probable cause to believe defendant had committed the crimes with which he was charged. The magistrate knew that the defendant had been arrested after he was forced from the house, for which a search warrant was sought, and that the weapon used in the commission of the crimes was not recovered. The magistrate was also informed concerning the brown twine which an officer saw while lawfully in the house. It was described to the magistrate as the same color, size and texture as that used to tie the victims. The affidavits also stated that the defendant's brother-in-law, a police officer employed by the Wheaton, Illinois, police department, told the affiants that on April 22 or 23 defendant had in his possession bullets of the same caliber used on the victims and that the defendant carried a handgun in his truck capable of firing the bullets that were taken from the victims' bodies. The magistrate was also informed that the assailant had in his possession a cloth bag in which he carried the twine and that his face had been covered with a terrycloth towel which was tied

with brown twine. An officer testified before the magistrate that a military button had been found at the scene of the crime and that defendant was, at that time, a member of the United States Army. The property listed in the search warrant consisted of the gun, bullets, brown twine, towel, white laundry bag, multicolored plaid shirt (assailant had been described as wearing a multicolored plaid shirt) and clothing with military-type buttons, with a button missing. With the exception of this last item, there was testimony that the assailant had all of these items in his possession when the crimes were committed. The defendant had returned to the house, for which the search warrant was sought, the same day the crimes were committed, had slept there overnight, and had been forced from the building the next morning by the use of tear gas and did not have the items listed in the search warrant in his possession when he came from the house.

Whether or not probable cause exists in a particular case depends upon the totality of the circumstances and facts known to the officers and court when the warrant is applied for. In deciding the question of probable cause the courts are not disposed to be unduly technical. Rather, the probabilities considered are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329; *People v. Clay* (1973), 55 Ill. 2d 501, 505.

Probable cause means simply that the facts and circumstances within the knowledge of the affiant were sufficient to warrant a man of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched. It is not required that the complaint or affidavits show beyond a reasonable doubt that the warrant should be issued. (See *People v. Fiorito* (1960), 19 Ill. 2d 246, 257; *People v. Francisco* (1970), 44 Ill. 2d 373, 376.) In our case, even if we exclude defendant's allegedly invol-

untary statement that the gun was in the basement of the house, the information before the magistrate was sufficient to establish probable cause for the issuance of the search warrant. The court held extensive hearings and made findings of fact. The trial court's determination of factual matters in a hearing on a motion to suppress will not be disturbed unless manifestly erroneous. (*People v. Conner* (1979), 78 Ill. 2d 525, 532; *People v. Williams* (1974), 57 Ill. 2d 239, 246; *People v. Clay* (1973), 55 Ill. 2d 501, 505.) We conclude that the trial court's determination, even excluding consideration of the involuntary statement, was not manifestly erroneous.

The defendant next contends that he was denied a fair trial because the jury was selected in compliance with *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, resulting in a conviction-prone jury. We need not address that issue here because we held in *People v. Lewis* (1981), 88 Ill. 2d 129, 147, that a jury qualified in compliance with *Witherspoon* does not affect the validity of the conviction.

The defendant also contends that certain studies demonstrate that a venire qualified in compliance with *Witherspoon* results in a jury not only conviction prone, but also unwilling to accept an insanity defense. We need not address that issue because, as will be discussed later, this defendant did not present an insanity defense and was not entitled to an insanity-defense instruction.

The defendant makes the further objection that the exclusion of veniremen solely on the basis of their refusal to follow the death penalty law denies the defendant his right to a jury representative of a cross-section of the community in violation of his sixth and fourteenth amendment rights. (*Cf. Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692.) This contention was specifically rejected in *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, and we reject it also. In *Lockett*

the court stated:

> "Nor was there any violation of the principles of *Taylor v. Louisiana, supra.* In *Taylor,* the Court invalidated a jury selection system that operated to exclude a 'grossly disproportionate' [citation] number of women from jury service thereby depriving the petitioner of a jury chosen from a 'fair cross-section' of the community [citation]. Nothing in *Taylor,* however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge." (*Lockett v. Ohio* (1978), 438 U.S. 586,596-97, 57 L. Ed. 2d 973, 984-85, 98 S. Ct. 2954, 2960.)

(See *Spinkellink v. Wainwright* (5th Cir. 1978), 578 F.2d 582.) The right to trial by jury or the right to a representative jury does not include the right to be tried by jurors who have stated that they will refuse to follow the law.

We have previously rejected the contention that a juror who states that he would be able to decide the issue of guilt impartially should be permitted to pass on that issue notwithstanding his inability to vote for the death penalty. (*People v. Gaines* (1981), 88 Ill. 2d 342, 357.) In *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47, we also rejected the argument that the mere conviction of a defendant by a jury establishes "good cause" under section 9—1(d)(2)(C) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)(2)(C)) to excuse the convicting jury and to impanel another jury for sentencing purposes. *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47.

The defendant states that of the four veniremen excused for cause, over defense objection, only one stated that he would automatically vote against the death penalty, while the answers of the other three jurors were "equivocal." The defendant's characterization of the potential jurors' answers results from his focus on a single question and answer in isolation from others. (*People v. Gaines* (1981), 88 Ill. 2d 342, 352.) The defendant also focuses on the answers given to general questions instead of the answers given to specific questions dealing with the willing-

ness or unwillingness of a potential juror to follow the death penalty law. Our examination of the record satisfies us that the standards of *Witherspoon* are clearly met. The record unambiguously establishes that each of these veniremen would not impose the penalty of death regardless of the evidence. They have not stated that they have only general religious or moral objections to the death penalty, but have made it unmistakably clear that they would automatically vote against the death penalty without regard to the evidence or the law. In considering any inconsistencies in the answers given by a venireman, we recognize the superior position of the trial judge to ascertain the meaning which the one being questioned intends to convey. *People v. Gaines* (1981), 88 Ill. 2d 342, 357.

The defendant next claims that the trial court erred in ruling that toxic psychosis is not an insanity defense under section 6—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—2). The defendant's position is that the trial court should have instructed the jury on toxic psychosis as a form of mental disease or defect under section 6—2 and also instructed the jury on the defense of voluntary intoxication. (Ill. Rev. Stat. 1977, ch. 38, par. 6—3.) The defendant also claims that the trial court misled him into believing that he would instruct the jury on insanity by allowing the defendant's expert witnesses to testify, thereby denying him a fair trial.

The State argues that toxic psychosis, under the facts of this case, is not a mental disease or defect in the legal sense. The State argues that the voluntary-intoxication or drugged-condition provision of section 6—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 6—3) should be read to qualify or limit the legal meaning of the term "mental disease or mental defect" in section 6—2, so that a "mental disease or mental defect" does not include a condition which might otherwise qualify as a mental disorder from a medical viewpoint when that condition is attrib-

utable solely to voluntary intoxication on alcohol or drugs or both. The State also contends that the trial court did not mislead the defendant.

The defendant testified that on the night of April 23, 1978, and into the morning of April 24, 1978, he had consumed a few beers, a marijuana cigarette and a "mint leaf or, as it's called, dust." The mint leaf was soaked in a PCP or phencyclidine compound and dried. The defendant testified that he had used PCP on only three prior occasions. The defendant testified that he had no actual recollection of what he had done between 12:30 a.m. and 5:30 a.m. on April 24, 1978. The crimes occurred at approximately 4 a.m. on April 24.

The defendant also testified that his "recollection" of the incident and the information he gave his expert witnesses was from "bits and pieces of dreams." The dreams started about one month after he was incarcerated. The defendant also indicated that his "recollection" of the incident was taken from reports and interviews from his attorney that the defendant had read.

The defendant had three expert witnesses testify in his behalf. Doctor Lyle Rossitter, a psychiatrist, testified that the defendant was suffering from a mental disease; namely, "a toxic psychosis, secondary to some sort of chemical or drug intoxication," which is listed as a mental disease in the Diagnostic and Statistical Manual of Mental Disorders (2d ed. 1968), published by the American Psychiatric Association. Doctor Rossitter's opinion was that the defendant could not appreciate the criminality of his acts or conform his conduct to the requirements of the law.

Doctor Rossitter, however, indicated that he had several reservations about his diagnosis and opinion. He testified that the defendant was not sure what substance he had ingested and that would affect his opinion. Secondly, the defendant's previous experiences with PCP were peaceful, calm experiences, whereas the experience in issue was vio-

lent and fearful. His third reservation was the source of the defendant's information. The doctor refused to accept the defendant's reconstruction through "bits and pieces of dreams" as an accurate representation of what the defendant actually experienced at the time of the offense. He also testified that such dream reconstruction, when the events are beyond recall due to amnesia, is not an acceptable method to arrive at a diagnosis or opinion in psychiatry. His diagnosis and opinion were, therefore, contingent upon accepting the defendant's reconstruction of the events through his dreams, even though the doctor himself could not accept such a reconstruction and psychiatry, generally speaking, does not use dreams to reconstruct events.

On cross-examination, Doctor Rossitter testified, in response to a hypothetical question based on Lori Rowe's testimony concerning the events, that the defendant was capable of acting intentionally and that, within a reasonable degree of medical and psychiatric certainty, no mental disease or defect existed, even though the defendant had used PCP and drank a few beers.

Doctor Wayne Tuteur, a psychiatrist, testified in response to a hypothetical question based on defendant's reconstruction of the events, that the hypothetical man was suffering from a mental disease called psychosis with drug intoxication. The doctor also testified that the hypothetical man lacked substantial capacity to either appreciate the criminality of his conduct or conform his conduct to the law. On cross-examination the doctor testified that he had never done any research in the area of PCP.

Doctor Frank Fiorese, a toxicologist, testified as to the physiological and psychological effects of PCP. He stated that certain amounts of PCP could cause nystagmus, slurred speech, blurred vision, and trembling muscles. The possible psychological effects include amnesia, excitement, anxiety, hallucination, and drowsiness.

The trial court ruled that toxic psychosis prompted by

the voluntary ingestion of alcohol and drugs does not constitute a mental disease or defect warranting an instruction under section 6—2. We agree.

The insanity defense is defined in section 6—2 as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1977, ch. 38, par. 6—2.)

Section 6—3, in relevant part, provides:

"A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:

(a) Negatives the existence of a mental state which is an element of the offense." Ill. Rev. Stat. 1977, ch. 38, par. 6—3.

The rule that a defendant who is legally insane will be relieved of criminal liability must be reconciled with the generally accepted rule that a defendant who is voluntarily under the influence of intoxicants at the time of the crime will not be relieved of criminal responsibility. The essential consideration is not whether the medical profession characterizes the defendant's use of intoxicants resulting in a psychosis as a mental disease or defect, but rather whether society should relieve from criminal responsibility a defendant who voluntarily ingests such intoxicants and then commits criminal acts. It is obvious to us that an actor should not be insulated from criminal responsibility for acts which result from a temporary mental state that is voluntarily self-induced.

We therefore hold that toxic psychosis induced by voluntary intoxication on drugs, alcohol or both is not a "mental disease or mental defect" which amounts to legal insanity under our statute. In *Upstone v. People* (1883), 109 Ill. 169, 175, the court stated, "The question in the case was,

whether there was but a temporary insanity, produced immediately by intoxication, or fixed insanity. If it was the former, it furnishes no excuse." We hold the same is true under our present statute and find that a majority of jurisdictions agree. (*State v. Ingram* (Mo. 1980), 607 S.W.2d 438; *Jackson v. State* (1980), 273 Ind. 49, 402 N.E.2d 947; *State v. Berge* (1980), 25 Wash. App. 433, 607 P.2d 1247; *O'Leary v. State* (Alaska 1979), 604 P.2d 1099; *Jackson v. State* (1979), 149 Ga. App. 253, 253 S.E.2d 874; *Commonwealth v. Hicks* (1979), 483 Pa. 305, 396 A.2d 1183; *Commonwealth v. Sheehan* (1978), 376 Mass. 765, 383 N.E.2d 1115; *State v. Kolisnitschenko* (1978), 84 Wis. 2d 492, 267 N.W.2d 321; *State v. Toth* (1977), 52 Ohio St. 2d 206, 371 N.E.2d 831; *State v. James* (1977), 223 Kan. 107, 574 P.2d 181; *State v. Clarken* (Minn. 1977), 260 N.W.2d 463; *Barrett v. United States* (D.C. App. 1977), 377 A.2d 62; *State v. Plummer* (1977), 117 N.H. 320, 374 A.2d 431; *State v. Fox* (1975), 112 Ariz. 375, 542 P.2d 800; *State v. Hall* (Iowa 1974), 214 N.W.2d 205; *People v. Kelly* (1973), 10 Cal. 3d 565, 516 P.2d 875, 111 Cal. Rptr. 171; *Demouchette v. State* (Tex. Crim. App. 1973), 502 S.W.2d 712; *State v. Linn* (1969), 93 Idaho 430, 462 P.2d 729; *Cirack v. State* (Fla. 1967), 201 So. 2d 706; see also *United States v. Shuckahosee* (10th Cir. 1979), 609 F.2d 1351; *Springer v. Collins* (4th Cir. 1978), 586 F.2d 329; *United States v. Burnim* (9th Cir. 1978), 576 F.2d 236; *United States v. Romano* (5th Cir. 1973), 482 F.2d 1183; *United States v. Jewett* (8th Cir. 1971), 438 F.2d 495; *United States v. Currier* (2d Cir. 1969), 405 F.2d 1039; Annot., *Modern Status of the Rules as to Voluntary Intoxication as Defense to Criminal Charge,* 8 A.L.R.3d 1236 (1966); Annot., *Effect of Voluntary Drug Intoxication Upon Criminal Responsibility,* 73 A.L.R.3d 98 (1976).

Simply stated, a voluntary intoxication or a voluntary drugged condition does not raise the defense of insanity, but is governed by section 6—3 and may be used to negate

the existence of the mental state which is an element of the crime. (Ill. Rev. Stat. 1977, ch. 38, par. 6—3.) A voluntary intoxication or a voluntary drugged condition precludes the use of the insanity defense *unless* the mental disease or defect is traceable to the habitual or chronic use of drugs or alcohol (*State v. Toth* (1977), 52 Ohio St. 2d 206, 371 N.E.2d 831) and such use results in a "settled" or "fixed" permanent type of insanity. (*People v. Cochran* (1924), 313 Ill. 508; *Upstone v. People* (1883), 109 Ill. 169; *People v. Jones* (1977), 56 Ill. App. 3d 600; *People v. Mask* (1975), 34 Ill. App. 3d 668; see *O'Leary v. State* (Alaska 1979), 604 P.2d 1099; *Jackson v. State* (1980), 273 Ind. 49, 402 N.E.2d 947; *State v. Kolisnitschenko* (1978), 84 Wis. 2d 492, 267 N.W.2d 321; *State v. James* (1977), 223 Kan. 107, 547 P.2d 181; *Barrett v. United States* (D.C. App. 1977), 377 A.2d 62; *People v. Kelly* (1973), 10 Cal. 3d 565, 516 P.2d 875, 111 Cal. Rptr. 171; *Cirack v. State* (Fla. 1967), 201 So. 2d 706.) There is not evidence in the record that this defendant was a habitual or chronic user of drugs or alcohol, or that the claimed disease or defect was "settled" or "fixed."

The defendant relies on *People v. King* (1973), 181 Colo. 439, 510 P.2d 333, and *People v. Kuhn* (1979), 68 Ill. App. 3d 59. Neither case deals with this particular issue and, therefore, we will not discuss them further.

The trial court properly instructed the jury on the defense of voluntary intoxication and properly refused, as a matter of law, to instruct the jury on the insanity defense. See *United States v. Shuckahosee* (10th Cir. 1979), 609 F.2d 1351, 1355; *O'Leary v. State* (Alaska 1979), 604 P.2d 1099, 1103; *State v. Toth* (1977), 52 Ohio St. 2d 206, 210, 371 N.E.2d 831, 834.

The defendant also contends that the trial court misled him into believing that the jury would be instructed on the insanity defense by allowing the defendant's expert witnesses to testify on that issue, thereby denying him a fair

trial. The defendant's argument essentially is that the trial court's response to the State's motion to strike the insanity defense implied that the court would instruct the jury on that issue.

We find that the defendant's contention is wholly without merit. The record unequivocally supports the State's position that it attempted to head off any surprise later in trial by making defense counsel fully aware of its objections to the use of the insanity defense in this case before defendant presented any evidence. The trial judge did not either expressly or impliedly rule on the issue at that time. In fact, defense counsel urged that the trial judge not rule on the question until after the expert witnesses testified and the evidence was in.

Again, during the course of the trial, defense counsel was made aware of the prosecution's continuing objections to defendant's evidence on the insanity defense. The court made it clear at that time that it had not ruled that there was or was not sufficient evidence to raise such a defense. We find this issue urged by the defendant to be totally unsubstantiated and a waste of counsel's time and the time of this court; it should not have been raised.

The defendant next objects to the trial court's ruling which allowed a psychologist and psychopharmacologist, Doctor Ronald Siegel, to give opinion testimony on the question of the defendant's ability to act intentionally while under the influence of alcohol and PCP.

The court ruled that the State's expert witness could not testify as to whether the defendant had a mental disease or defect, but that he could testify as to whether the defendant had the ability to act intentionally. The court stated that Doctor Siegel was both a pharmacological expert and a psychological expert and could give his opinion as to the effect of the drug on the defendant as that relates to intoxication only. Thus, this witness' testimony would relate only to the intoxication defense under section

6—3 and not the insanity defense under section 6—2. Defendant's objections to this testimony are that Doctor Siegel was not a qualified "expert" to offer an opinion as to defendant's "intent," that only a psychiatrist could testify in this manner, and that his opinion was on an ultimate issue in the case, thus invading the province of the jury. We do not agree.

Doctor Siegel testified that, in his opinion, the defendant "was not rendered incapable of acting *** intentionally." His opinion was based on his observations and the examinations that he conducted on the defendant, plus his education, experience and research on PCP. Doctor Siegel also testified that the defendant's conduct was not "consistent with the phenominology of PCP intoxication, or indeed, other types of hallucinogenic intoxications." In response to the State's hypothetical based on Lori Rowe's testimony and the defendant's testimony that he had consumed beer and had smoked marijuana and used PCP, Doctor Siegel stated that the hypothetical man "was not so intoxicated as to render him incapable of acting intentionally at that time."

We note that the burden of establishing the qualifications of an expert witness rests on the proponent of his testimony—in this case, the State. (*People v. Park* (1978), 72 Ill. 2d 203, 209.) The standard of review in this area is whether the trial court has abused its discretion in permitting this particular "expert" witness to testify. (*People v. Park* (1978), 72 Ill. 2d 203, 209; *People v. Sawhill* (1921), 299 Ill. 393.) "[T]he *trial court must be left to determine,* absolutely and without review, the fact of possession of the required qualification by a particular witness." (2 Wigmore, Evidence sec. 561 (Chadbourne rev. ed. 1979).) The trial court did not abuse its discretion in permitting Doctor Siegel to testify.

Doctor Siegel is both a psychologist and psychopharmacologist. A psychopharmacologist is one who specializes in

the study of the effects of drugs on behavior and usually is trained in psychology, pharmacology, medicine, neurology, chemistry, and related disciplines.

That expert testimony concerning the drug PCP was necessary cannot be contested. The jurors, like most people, had a limited understanding of this drug and, therefore, the knowledge and experience of Doctor Siegel was needed as expert testimony in this area. "The true test of the admissibility of such testimony *** is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the Court or the jury in determining the questions at issue." (7 Wigmore, Evidence sec. 1923 (Chadbourne rev. ed. 1978); see *Miller v. Pillsbury Co.* (1965), 33 Ill. 2d 514, 516.

We believe that Doctor Siegel, in view of his education, qualifications, experience, and extensive research in the area of PCP, was eminently qualified to give his opinion as to whether the defendant had the ability to act intentionally at the time of the crime, as that relates to the defense of voluntary intoxication. The doctor's opinion was based on his education, experience and research in the area of the effects of drugs on humans, plus his examinations of the defendant.

The defendant's reliance on *People v. Noble* (1969), 42 Ill. 2d 425, is misplaced. *Noble* dealt with a clinical psychologist diagnosing and giving his opinion on the issue of the defendant's sanity. *Noble* also dealt with a psychiatrist's use of testing done by a psychologist pursuant to that psychiatrist's direction. In *Noble* the court held that the clinical psychologist should have been permitted to testify as to the tests done, the procedure followed and the test results, at least when a psychiatrist has requested such tests. Also, that court held that the trial court should not have restricted the psychiatrist's use of the psychological testing

he had ordered to evaluate the defendant. We note that the court indicated that "the trend of the more recent decisions is to permit a properly qualified psychologist to testify as to the nature and results of psychological tests \*\*\*" (42 Ill. 2d 425, 433) and "even to the extent of permitting the expression of opinions as to the mental condition of the individual" (42 Ill. 2d 425, 434) when a qualified psychologist testifies. (See *People v. Nelson* (1980), 92 Ill. App. 3d 35; *People v. Whitaker* (1980), 87 Ill. App. 3d 563.) We also note that the General Assembly enacted a statute permitting a qualified clinical psychologist to testify on a defendant's fitness, insanity or mental illness. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—2—5.) However, in this case Doctor Siegel did not testify on the issue of defendant's insanity. The trial court restricted Doctor Siegel's testimony to defendant's intoxication defense.

The defendant next objects to the admission of the testimony of Scott Carlson, a Winfield police officer. Defendant claims that the testimony was irrelevant and implied criminal misconduct on the part of the defendant.

Officer Carlson testified that he stopped a red Ford truck driven by James Free at approximately 4 a.m. on April 23, 1978, in Winfield, Illinois. Carlson observed that the defendant was carrying a knife in a leather case on his left hip. He talked with the defendant for six to seven minutes and released him.

The trial court ruled that the testimony was relevant because it placed the defendant, an out-of-State resident, in the vicinity of the crime. Also, that it was relevant to show the defendant's possession of a red Ford pickup truck, which was seen at another time in the area where the crime was committed. We agree.

The testimony did not imply criminal misconduct on the part of the defendant. The trial court was very cautious so as to prevent any indication, through Officer Carlson's testimony, that the defendant may have violated the law.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Fed. R. Evid. 401; *People v. Monroe* (1977), 66 Ill. 2d 317, 322.) "Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable." (*Marut v. Costello* (1966), 34 Ill. 2d 125, 128.) Officer Carlson's testimony was relevant to place the defendant in the vicinity of the crime within 24 hours before it was committed. It is particularly relevant here because the defendant was an out-of-State resident who was residing in Iowa with his parents at the time of the offense, while on leave from his army post in the State of Washington.

The defendant next contends that during the guilt phase, and again at the aggravation/mitigation phase of the trial, testimony concerning the victims' families was admitted which was irrelevant and highly prejudicial, thereby denying the defendant a fair trial. The State made certain references to Bonnie Serpico's family in its opening statement, and it had Andrew Serpico, the victim's husband, testify at the guilt phase of the trial. We will discuss later whether the testimony at the aggravation/mitigation phase of the trial was properly admitted.

Mr. Serpico testified that he was married to Bonnie Serpico for 14 years. He testified that they had two children and the evening before the murder they had gone out to a restaurant for dinner. His testimony established the identity of the murder victim and that she was a living person in good health prior to her departure for work the night she was murdered. He also established that certain clothing found at the scene of the crime belonged to Bonnie Serpico and that she had worn those clothes to work the night she was murdered. He testified that his wife was survived by a sister who was pictured in a photograph he

gave to the police.

Defendant argues that these statements constitute reversible error, relying on this court's decisions in *People v. Wilson* (1972), 51 Ill. 2d 302, *People v. Bernette* (1964), 30 Ill. 2d 359, *People v. Dukes* (1957), 12 Ill. 2d 334, and *People v. Jackymiak* (1943), 381 Ill. 528.

A defendant's guilt must be established by competent evidence uninfluenced by bias and prejudice. Generally, the rule is that "where testimony in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence." (*People v. Bernette* (1964), 30 Ill. 2d 359, 371.) "However, every mention of a deceased's family does not *ipso facto* entitle the defendant to a new trial, since in certain instances, dependent upon the facts, such a statement can be harmless." *People v. Jordan* (1967), 38 Ill. 2d 83, 91-92; *People v. Wilson* (1972), 51 Ill. 2d 302; *People v. Golson* (1965), 32 Ill. 2d 398; *People v. Brown* (1964), 30 Ill. 2d 297.

The case at bar is such an instance, since significant factual distinctions exist between this case and the ones relied on by the defendant. Those cases reveal that the prosecution there did more than just make the jury aware of the fact that the deceased left behind a spouse and children. Rather, in those cases, the prosecution dwelt upon the deceased's family in closing argument to the point that the jury could have related that evidence to the defendant's guilt. Herein, the evidence was not accompanied by testimony or statements of the tender years of the children left behind by Bonnie Serpico, nor was there an inflammatory closing argument. (See *People v. Jordan* (1967), 38 Ill. 2d 83, 92.) Also, the trial court ruled the testimony admissible for the purpose of identification of the decedent. (See

*People v. Brown* (1964), 30 Ill. 2d 297; *People v. Golson* (1965), 32 Ill. 2d 398, 410.) Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members.

We believe that the testimony of Andrew Serpico and his references to his family were properly admitted, that the statements were incidental and not calculated, and that they were not presented in such a manner as to cause the jury to believe this fact to be material as to the defendant's guilt. See *People v. Wilson* (1972), 51 Ill. 2d 302, 307.

The defendant contends that the admission of certain physical evidence and photographs during the trial caused him prejudice requiring the reversal of his convictions. The items the defendant objects to were seized at his residence in Dubuque pursuant to a search warrant. The items include a gun holster, boxes of ammunition, an ammunition-reloading device, plastic earmuffs, a gun box, a photo of clothing and the area where it was found, and a photo of the murder weapon and related paraphernalia.

The State argues that the physical evidence is relevant to prove constructive possession and control of the murder weapon and the bag in which the weapon was apparently kept, together with ammunition suitable for the commission of the crime.

The trial court ruled the evidence admissible. We believe the trial court's ruling was proper. As we stated previously, relevant evidence means evidence having any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence. The general rule is that physical evidence may be admitted provided there is proof to connect it with the defendant and the crime. (See *People v. Ashley* (1960), 18 Ill. 2d 272; *People v. Miller* (1968), 40 Ill. 2d 154.) It is only necessary that the object at least be suitable for the commission of the crime (*People v. Miller* (1968), 40 Ill. 2d 154), but it is not necessary that the object actually be used in commit-

ting the crime (*People v. Magby* (1967), 37 Ill. 2d 197).

In this case the State had the burden of proving the defendant had possession of the gun. The gun admitted in evidence was the gun used to kill Bonnie Serpico and to injure Lori Rowe. Detective Velon testified that when he searched the house he found a bag in the basement of the house which contained the gun later proved to be the murder weapon. Also in that bag was the evidence objected to by the defendant—the gun holster, plastic earmuffs, boxes of ammunition, including .357-caliber and .38-caliber bullets, and a belt with 13 rounds of ammunition on it. The gun was in the holster, and that was attached to the belt which had bullets on it. All of these items were found inside the bag. The reloading apparatus and component parts were located in the immediate area of the bag.

We believe the evidence was relevant because it tended to establish the existence of the material fact that the defendant possessed a gun and, in fact, must have been familiar with guns. There was testimony that the defendant entered the office building with a "cloth bag," though it was never definitely stated that the "cloth bag" and the bowling bag or gym bag, as it was also described, were one and the same. Lori Rowe also testified that Bonnie Serpico looked in the bag and stated, "You came prepared for this," and the defendant replied, "Yes, I've all sorts of stuff in there." The defendant's cousin testified that, when the defendant arrived at her house in St. Charles at 6:30 a.m. on April 24, 1978, some 2½ hours after the crime, she saw the defendant get out of his truck and take a gym bag from the cab of the truck and put it in the rear of the truck.

We must not confuse the distinction between the admissibility of evidence and its probative value. (See *People v. Scott* (1963), 29 Ill. 2d 97, 113; McCormick, Evidence sec. 185, at 434 (2d ed. 1972).) In *Scott* the court held that the trial court had erred in sustaining defendant's objection to

the introduction of a wrench which had been found near the decedent's body. The court stated:

"The argument of the defendant that the wrench must first be connected with the defendant before it may be admitted into evidence confuses the distinction between the admissibility of evidence and its probative value. *** The defendant is entitled to argue to the jury the lack of any connection between the wrench and the defendant, or the lack of proof that the defendant owned or used the wrench; he may point out the weakness of its probative value, but he cannot bar its admission." *People v. Scott* (1963), 29 Ill. 2d 97, 113-14.

The defendant relies on *People v. Miller* (1968), 40 Ill. 2d 154, and *People v. Smith* (1952), 413 Ill. 218. In *Miller* the court stated that there was no showing that the object admitted was even suitable for the commission of the crime or that the items were in any way connected with the defendant because they were found in a codefendant's car. *Miller* did not deal with the issue present here—the State here was attempting to prove that this murder weapon was connected to this defendant.

*People v. Smith* (1952), 413 Ill. 218, is distinguishable because the items admitted into evidence were never connected by the State to the crime committed. The items admitted into evidence were two sawed-off shotguns and ammunition for them not alleged to be connected with the crime. The gun used to commit the murder in *Smith* was identified and admitted into evidence. Also, the items of evidence improperly admitted were other weapons obviously not used in the crime.

Here, only one gun—the murder weapon—was introduced into evidence. The other items were relevant to show familiarity with guns in general and to connect the defendant with the murder weapon in particular. The other items were closely enough related to the use and maintenance of the murder weapon to make evidence that defendant possessed these items relevant. These items, as

well as the photographs, were properly admitted into evidence.

Even if some of this evidence were irrelevant, no prejudicial error resulted to this defendant. The evidence of the defendant's guilt is overwhelming, and the introduction of this physical evidence could not have served to arouse or inflame the jury.

We now address the issues raised by the defendant relating to the death penalty phase of his trial.

The defendant argues that the indictment did not sufficiently inform him that the death penalty would be sought. The basis for this argument is that the indictment did not charge the defendant with burglary, and although he was charged with attempted rape, defendant argues that an attempt is not an aggravating factor. In *People v. Walker* (1982), 91 Ill. 2d 502, 511, we held that the death penalty statute "does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony or an attempted felony." (*People v. Walker* (1982), 91 Ill. 2d 502, 511.) Consequently, the defendant was sufficiently informed in the indictment that the death penalty could be sought because he was charged with the murder and attempted rape of Bonnie Serpico. See *People v. Ruiz* (1982), 94 Ill. 2d 245, 265.

In *People v. Brownell* (1980), 79 Ill. 2d 508, 524, we stated:

"Secondly, without holding that every indictment must contain every aggravating factor which the State will attempt to prove, we hold that, in the indictment involved here, one of the aggravating factors found by the court at the sentencing hearing was sufficiently alleged in the indictment to fulfill the requirements of law."

As we have stated, in our case one of the aggravating factors was sufficiently alleged in the indictment so as to inform the defendant of the potential penalty in this case. The defendant was also made aware on the third day of jury selection that burglary would also be proved as an ag-

gravating factor. Thus, the defendant was sufficiently informed of both aggravating factors prior to the introduction of testimony at the trial.

Also, the trial court ruled prior to jury selection that the jury must be qualified under *Witherspoon* and that each side would have 20 peremptory challenges since it was a death penalty case.

The defendant's next claim is that the prosecutor's closing argument concerning the insanity defense at the guilt phase of the trial prejudiced the defendant so as to establish "good cause" under section 9—1(d)(2)(C) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)(2)(C)) to discharge the first jury and impanel a new jury for sentencing. Defendant asserts that the prosecutor's closing argument at the guilt phase that no insanity defense existed as a matter of law and that the intoxication defense was a false defense or a lie predisposed the jury to reject evidence of extreme mental or emotional disturbance at the sentencing phase.

First, we note that the closing comments alluded to by the defendant now were not objected to at trial, thus precluding these claims. *People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Carlson* (1980), 79 Ill. 2d 564, 575-78.

Even if not precluded by waiver, our review of the record shows the prosecutor's argument to be proper comment upon the evidence. Also, the sentencing phase of the trial did not begin until five weeks after the jury returned its verdict, and it is pure conjecture on the part of the defendant that any prejudice resulted to him. "Good cause" to impanel a new jury for the purposes of sentencing was not shown. See *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47.

The defendant next contends that the jury was improperly instructed in several aspects as to whether the death penalty should have been imposed. The defendant offered two instructions detailing nonstatutory mitigating factors to be considered by the jury. The court refused both in-

structions and instructed the jury as follows:

> "Mitigating factors include, *but are not limited to the following circumstances*:
>
> (1) The defendant has no significant history of prior criminal activity.
>
> (2) The murder was committed while the defendant was under the influence of exteme mental or emotional disturbance, although not such as to constitute a defense to prosecution.
>
> If, from your consideration of the evidence, you find that any of the above mitigating factors are present in this case, *or that any other mitigating factors are present in this case,* then you should consider such factors in light of any existing aggravating factors in determining whether the death sentence shall be imposed." (Emphasis added.)

This instruction includes the two relevant statutory mitigating factors and also properly provides that mitigating factors are not limited to those listed, but that the jury should consider any other mitigating factors present in this case. This instruction, contrary to defendant's contention, satisfies *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954. The instruction given required the jury to consider all mitigating factors as required by *Lockett.* It does not preclude the jury "from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65.

Defendant's next alleged error is that the trial court did not instruct the jury to consider the potential of the defendant to be restored to useful citizenship pursuant to section 11 of article I of the 1970 Illinois Constitution. This issue was recently decided in *People v. Gaines* (1981), 88 Ill. 2d 342, 381-82, where we held that the requirement of section 9—1(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)) that the sentencing jury consider

"any mitigating factors which are relevant to the imposition of the death penalty" was sufficient to satisfy the constitutional provision. As we have stated, the jury was so instructed in this case.

Defendant next alleges that his instruction No. 6(a) should have been given. It states that the jury is not required to find any statutory mitigating factors in order to conclude that the death penalty should not be imposed. Our previous discussion demonstrates that the jury was instructed to consider all mitigating factors, not just statutory mitigating factors, and we need not discuss this issue further.

The defendant's last contention regarding the instructions given at the aggravation/mitigation phase is that the jury was not instructed that the prosecution bore the burden of proving beyond a reasonable doubt that no mitigating factors are present. *People v. Brownell* (1980), 79 Ill. 2d 508, disposed of this issue. In *Brownell* we stated that a unanimous jury or the court must *weigh* the mitigating factors against the aggravating factors and must conclude that there are no mitigating factors sufficient to preclude the imposition of the death sentence. (*People v. Brownell* (1980), 79 Ill. 2d 508, 534; Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(g), (h).) It is not a question of the State proving an issue beyond a reasonable doubt at this phase of the trial. Rather, it is a weighing process, which we determined to be constitutional in *Brownell.*

The defendant also argues that certain testimony admitted at the aggravation/mitigation phase of trial was not relevant. Specifically, defendant contends that Officer Scott Carlson's more detailed testimony of a traffic stop of the defendant in Winfield, Illinois, about 24 hours before the crime was irrelevant. Defendant also contends that testimony concerning the victim's family was irrelevant and prejudicial, violating his due process rights and thereby requiring a new sentencing hearing.

Section 9—1(c) states:

"The court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).)

Section 9—1(e) provides:

"Any information relevant to any additional aggravating factors or any mitigating factors indicated in Subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e).)

Our statute clearly provides that the only finding necessary in determining the admissibility of evidence at the aggravation/mitigation phase is that the evidence be relevant. The rules of evidence, as provided in section 9—1(e), are suspended at this stage, so that the judge or jury, as the sentencing authority, may have all relevant evidence before it. In this phase of the sentencing hearing, the State and defendant are allowed considerable leeway in the presentation of relevant evidence as long as the evidence is also reliable. See *People v. La Pointe* (1981), 88 Ill. 2d 482, 497; *People v. Adkins* (1968), 41 Ill. 2d 297, 300.

In *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, the court noted the importance of placing before the sentencing jury all relevant factors and circumstances focusing on the character and record of the individual offender and the circumstances of the particular offense. *People v. La Pointe* (1981), 88 Ill. 2d 482, emphasizes the broad standard governing admissibility of evidence in sentencing proceedings without regard to the "restrictive rules of evidence properly applicable to the trial," quoting *Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083. *La Pointe* also emphasized that the factors controlling admissibility of evidence in a sentencing hearing were the relevance and reliability of the proffered evidence. (See *People v. La*

*Pointe* (1981), 88 Ill. 2d 482, 498.) The admission of relevant and reliable evidence at the sentencing hearing does not violate the due process guarantees of the Federal Constitution. See *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.

The same benchmarks of relevance and reliability apply whether the sentencing authority is the trial judge or the jury. Whether evidence is relevant and reliable is initially determined by the trial court in the exercise of its informed discretion. *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.

*La Pointe* dealt with prior misconduct for which the defendant was not prosecuted or convicted. We stated there that "[t]he conduct testified to was relevant to a determination of a proper sentence in that it bore upon the likelihood or unlikelihood that defendant would commit other offenses; it appeared trustworthy; defendant had the opportunity to face and cross-examine the witness; and the accuracy of the information was not challenged." *People v. La Pointe* (1981), 88 Ill. 2d 482, 498-99.

Applying the *La Pointe* test, we find that Officer Carlson's testimony was both relevant and reliable. He testified that he observed a red Ford pickup truck driving slowly past residences and commercial establishments in the downtown area of Winfield. The driver of the truck appeared to be looking at the residences and businesses. It was approximately 4 a.m. on April 23, 1978, approximately 24 hours before the murder in Glen Ellyn. Officer Carlson noticed a car next to the truck and the occupants appeared to be talking by use of their citizen-band radios. The officer also testified that he ran a license check on the Ford truck and was informed that the owner of the truck had been convicted of theft some years earlier. All these facts combined to cause the officer to be suspicious, and he continued to follow the truck. Both vehicles continued through the town slowly, still appearing to look over the businesses

and houses. The officer then testified that he stopped the truck and determined that James Free was the driver. The officer had summoned help prior to the stop, and his fellow officer observed a gym bag in the truck.

Defense counsel elicited on cross-examination that the officer did not observe the driver of the truck commit any crime. Officer Carlson also testified on cross-examination that the defendant told him he was born in Winfield and lived there for a number of years. The officer testified that he told the defendant to look around town during the daytime, rather than in the early morning hours.

Relevance may be considered as existing in various degrees. We find this testimony to be sufficiently relevant to be admissible at the sentencing hearing. It again tied together the defendant, the red pickup truck and the gym bag. Although the testimony does not relate to an arrest or conviction, it did disclose the propensity of the defendant to "prowl around" at 4 a.m., approximately the hour at which the crimes were committed the next day. The testimony appeared trustworthy. Defendant had the opportunity to face and cross-examine the witness, and the accuracy of the information was not challenged. We can see no prejudice to the defendant by the admission of this testimony. The trial judge did not abuse his informed discretion in admitting this relevant and reliable evidence.

The defendant also contends that the testimony of Deborah Ahlstrand, a probation officer for Du Page County, was improperly admitted. She conducted a presentence investigation, interviewing approximately 18 people. Ahlstrand testified that she met with Bonnie Serpico's mother, husband and two children. She testified as to emotional effects on the family in general. She also testified that the Serpico family moved after the murder because the children and their grandmother could not enter the old house. Mr. Serpico told the probation officer that he felt "completely shut out" and that "the biggest loss was that his

two daughters would not have a mother to relate to as they were growing up, as they were experiencing young adulthood and marriage, pregnancy, those times when mothers and daughters have a close relationship."

The probation officer testified that Bonnie Serpico's mother was "particularly depressed over the way in which her daughter died." Also, that she took tranquilizers until June or July of 1979.

Ahlstrand also interviewed Lori Rowe's parents. Mrs. Rowe, the victim's mother, stated that her daughter was no longer trusting of other people but very suspicious of most people. The probation officer also testified that Miss Rowe had returned to college in the fall of 1978 and that she had not seen a psychiatrist or a psychologist since she was hospitalized immediately after the incident.

The defendant did not object to the admissibility of this testimony but only as to the admissibility of the presentence report itself, which was not admitted into evidence. In fact, the defendant requested that the presentence investigation and report be made over the State's objection. We conclude that the failure to object to the admission of this evidence operates as a waiver of the right to consider the question on appeal. (*People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Carlson* (1980), 79 Ill. 2d 564, 575-76.) As noted, the defendant did object to the introduction of the presentence report itself, and the court did not admit it. If a timely objection would have been made to the testimony of the probation officer concerning the results of her presentence investigation, the court could have ruled on the admissibility of the testimony now objected to. Not having given the court this opportunity, the defendant waived the right to raise the question in this court.

This court has held that testimony pertaining to a victim's surviving family is improper. (*People v. Bernette* (1964), 30 Ill. 2d 359.) However, the evidence complained of was not introduced at the guilt phase of the trial, or at

the phase of the trial wherein the existence of the aggravating factors must be proved. The relevant considerations controlling admissibility of evidence at the phase of the sentencing hearing with which we are now concerned are as follows: When establishing the presence of the statutory aggravating factors, the State's proof is governed by the rules of evidence. Only after the jury had determined that the State had established the aggravating factors beyond a reasonable doubt did the hearing move into the second phase of additional aggravating factors and mitigating factors as to which the rules of evidence are not applied. In this phase of the sentencing hearing the State and defendant are allowed considerable leeway in the presentation of relevant evidence. The Supreme Court in both *Gregg* (428 U.S. 153, 195, 49 L. Ed. 2d 859, 886-87, 96 S. Ct. 2909, 2935) and *Woodson* (428 U.S. 280, 303, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2991) and four members of that court in *Lockett v. Ohio* (1978), 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 989-90, 98 S. Ct. 2954, 2964-65 (Burger, C.J., joined by Stewart, Powell, and Stevens, JJ.), noted the importance of placing before the sentencing jury all relevant factors and circumstances which have an impact upon the imposition of an appropriate sentence. *Gregg* specifically noted that information which may have been irrelevant or extremely prejudicial on the question of guilt might be relevant and admissible in a sentencing hearing. (428 U.S. 153, 190, 49 L. Ed. 2d 859, 884, 96 S. Ct. 2909, 2933.) Our recent opinion in *People v. La Pointe* (1981), 88 Ill. 2d 482, 495-99, reemphasizes the broad standard governing admissibility of evidence in sentencing proceedings without regard to the " 'restrictive rules of evidence properly applicable to the trial,' " quoting *Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083. We also emphasized that the factors controlling admissibility were the relevance and reliability of the proffered evidence, a determination which lies within the dis-

cretion of the trial judge.

The defendant has raised *Henry v. Wainwright* (5th Cir. 1981), 661 F.2d 56, *cert. allowed* (1982), 457 U.S. 1114, 73 L. Ed. 2d 1326, 102 S. Ct. 2922, as additional authority relating to issues dealing with the third phase of his trial. The court in *Henry* held that a jury instruction permitting consideration of nonstatutory aggravating factors in a death penalty case was unconstitutional. We do not find *Henry* applicable because our statutory procedure is different from that of Florida's death penalty law, under which the defendant in *Henry* was sentenced.

Florida's death penalty law provides for only two phases—guilt and sentencing. That State's statute provides that only statutory aggravating factors should be considered by the jury. In *Henry* the trial judge gave an erroneous instruction in permitting the jury to consider "all factors which are aggravating." The defendant did not object at trial to the instruction, and the issue was waived on appeal. The Federal district court granted a writ of *habeas corpus,* and the court of appeals affirmed on constitutional grounds.

In Illinois, unlike Florida, the judge or jury *must* first determine whether the State has proved a statutory aggravating factor beyond a reasonable doubt before it proceeds to weigh aggravating and mitigating factors and to make its decision whether or not to sentence the defendant to death. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(g), (h); see *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909.) We conclude that the sentencing body's discretion, under our statute, is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action, satisfying *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, and its progeny.

The last argument raised by the defendant is that the death penalty cannot be imposed on him because it is an

excessive and disproportionate penalty in light of his character and personal background. Defendant relies on *People v. Carlson* (1980), 79 Ill. 2d 564, in which this court vacated the death sentence and remanded for the imposition of a lesser penalty. In *Carlson* the defendant had killed his ex-wife, a police officer and burned his ex-wife's home. The defendant and his ex-wife were divorced but planned to remarry soon. She cancelled their second marriage and told the defendant about her boyfriend and showed the defendant a diamond engagement ring and other gifts which had been given to her by her male friend. They returned to her home, and the defendant shot and killed his ex-wife and then set fire to the house. Police officers went to a bar to arrest the defendant and he killed one of the officers. Other evidence in the record showed that the defendant gave $3,200 in an envelope to a friend with instructions to give it to his daughter for his son's use.

We stated in *Carlson* that "[t]hese mitigating circumstances do not bespeak a man with a malignant heart who must be permanently eliminated from society." (*People v. Carlson* (1980), 79 Ill. 2d 564, 590.) This court went on to state, "[W]e see an individual with no past criminal record who would in all probability be leading a life acceptable to our society had not his unfortunate marital affair triggered this tragic sequence of events." *People v. Carlson* (1980), 79 Ill. 2d 564, 590.

Determining whether a death sentence is proper in a particular case "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991, see Ill. Const. 1970, art. I, sec. 11; *People v. Gleckler* (1980), 82 Ill. 2d 145, 162; *People v. Carlson* (1980), 79 Ill. 2d 564, 590.) A sentence does not offend the proportionality requirement if

it is commensurate with the seriousness of the crimes and gives adequate consideration to any relevant mitigating circumstances, including the rehabilitative potential of the defendant. (*People v. Carlson* (1980), 79 Ill. 2d 564, 587; *People v. Gaines* (1981), 88 Ill. 2d 342, 380-82.) This court has acknowledged the necessity to avoid arbitrary or capricious death sentences by adequately defining capital crimes, by directing sentencing discretion, and by providing adequate judicial review. (*People v. Lewis* (1981), 88 Ill. 2d 129, 164-65; *People v. Gleckler* (1980), 82 Ill. 2d 145, 161-62; *People v. Brownell* (1980), 79 Ill. 2d 508, 532-34.) We have repeatedly demonstrated our concern as to the responsibilities involved in our review of capital cases and have not hesitated to vacate death penalties where improperly imposed. *People v. Walker* (1982), 91 Ill. 2d 502; *People v. Gleckler* (1980), 82 Ill. 2d 145; *People v. Brownell* (1980), 79 Ill. 2d 508; *People v. Carlson* (1980), 79 Ill. 2d 564.

It is our opinion, however, that this case is not similar to *Carlson*. Unlike in *Carlson*, the tragic event here was not triggered by any innocent or independent event for which defendant was not responsible. Rather, this defendant acted deliberately with the intent to rape and kill two persons. Also, unlike *Carlson*, this defendant does have a history of past criminal activity. He was convicted of theft and testified that he had used various drugs during his lifetime. There was also testimony that the defendant carried a concealed weapon in his truck. Lori Rowe testified that the defendant stated that "he had done this before" and it was for the jury to draw an inference as to whether the defendant had done so or not. Testimony in mitigation was given concerning defendant's military service, his work record and his home life. However, existence of a mitigating factor does not necessarily preclude the imposition of the death penalty. *People v. Brownell* (1980), 79 Ill. 2d 508, 537.

Focusing on the individual offender and the circumstances of the particular offense, we are of the opinion that this case more nearly resembles *People v. Ruiz* (1982), 94 Ill. 2d 245, *People v. Lewis* (1981), 88 Ill. 2d 129, and *People v. Gaines* (1981), 88 Ill. 2d 342, than it does *Carlson.* Our responsibilities neither require nor permit reversal where no reasonable doubt of guilt exists, no reversible error has occurred, and there is no indication that the jury imposed the penalty in an arbitrary, capricious or uneven manner.

The defendant has not raised any error as to the sentences for the other offenses, and we therefore need not address these sentences.

We accordingly affirm the judgment of the circuit court of Du Page County. The clerk of this court is directed to enter an order fixing Tuesday, May 24, 1983, as the date on which the original sentence of death entered in the circuit court is to be executed. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and to the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Judgment affirmed.*

JUSTICE CLARK, concurring in part and dissenting in part:

I concur in the affirmation of guilt. I would, however, vacate the penalty of death. I feel it was improperly imposed.

The jury at the sentencing hearing found that Bonnie Serpico was killed in the course of a rape and burglary. After the jury determined that no mitigating factors existed that were sufficient to preclude the imposition of death, the defendant was sentenced to die.

I believe that the sentencing jury was under a misapprehension in sentencing the defendant. The defendant was never charged with or convicted of rape or burglary, and yet the jury concluded that the defendant committed the

murder in the course of a rape and a burglary.

I disapprove of the prosecuting attorney's introduction of evidence at the sentencing hearing of the alleged burglary when no such felony was charged or proved at trial. Because of the frequency with which this court has been confronted with questions of possible prosecutorial overreaching at the sentencing hearing, I believe it incumbent on us or perhaps on the legislature to adopt guidelines to be used.

In seeing that the penalty of death is not applied in an arbitrary or capricious manner (*Gregg v. Georgia* (1976), 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932), the United States Supreme Court has defined the State's responsibility to provide " 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey v. Georgia* (1980), 446 U.S. 420, 428, 64 L. Ed. 2d 398, 406, 100 S. Ct. 1759, 1764-65. See also *People v. Gleckler* (1980), 82 Ill. 2d 145, 162.

The rules of evidence that must be adhered to in a criminal trial in this State do not apply at the sentencing hearing. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e).) In *People v. La Pointe* (1981), 88 Ill. 2d 482, this court addressed the difference between the rules of evidence at trial and the rules at a sentencing hearing and recalled the words of the United States Supreme Court in *Williams v. New York* (1949), 337 U.S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079:

> "Rules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time-consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A

sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." (337 U.S. 241, 246-47, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083.)

Just the same it is clear that at a death penalty hearing the sentencing jury's attention should be focused on "the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954. See *People v. Walker* (1982), 91 Ill. 2d 502, 515.

I am concerned that the procedure at a death penalty hearing be such that we can be assured of rational and consistent sentences imposed by different juries. Justice Stewart in *Woodson* saw the "need for reliability in the determination that death is the appropriate punishment in a specific case," since there is a "qualitative difference" between the death penalty and all other forms of punishment. *Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.

Despite the broad statutory language, there should be limitations as to the evidence that can be considered by a sentencing jury—a group of men and women who are called upon to weigh the deliberate taking of a human life. Setting some definitive guidelines should help to assure equality of treatment at a sentencing hearing. For in the

words of Justice Marshall, "Where life itself is what hangs in the balance, a fine precision in the process must be insisted upon." *Lockett v. Ohio* (1978), 438 U.S. 586, 620, 57 L. Ed. 2d 973, 999-1000, 98 S. Ct. 2954, 2973 (Marshall, J., concurring).

If we allow the sentencing hearing to be completely unrestrained as to what can be admitted into evidence, we will encourage both the prosecution and defense counsel to search for the most colorful attention getter that, while extraneous to what happened or irrelevant to the defendant's character, could successfully divert the jury's attention. We should not allow such a result, for to do so is to risk that capital punishment will be imposed in an arbitrary way. And as the United States Supreme Court said in *Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204:

> "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."

See *People v. Gleckler* (1980), 82 Ill. 2d 145, 162.

I would propose that, as a step towards establishing guidelines for consistent sentencing to guard against jurors' imposition of the death penalty under the influence of passion or prejudice, the following limitations of evidentiary considerations at a death penalty hearing should be adhered to: If the evidence offered is extraneous to the facts and circumstances of the case or the character of the defendant, it is not admissible; if it would tend to divert the jury's attention from the aggravating or mitigating factors before them, it should be excluded; and if the evidence impinges upon any fundamental constitutional guarantee, it cannot be admitted at the sentencing hearing.

The United States Supreme Court has clearly indicated that "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice

or emotion." (*Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.) It does not appear to me that the decision to sentence James P. Free, Jr., to death was based upon reason. I dissent from the affirmation of the death penalty.

JUSTICE SIMON joins in this partial concurrence and partial dissent.

JUSTICE SIMON, also concurring in part and dissenting in part:

I join in the partial concurrence and partial dissent of Justice Clark and in his constructive proposal for establishment of guidelines to control death sentence hearings. I also believe that another grave error occurred at the sentencing stage which independently requires us to vacate the sentence of death.

The defendant complains that the testimony of Deborah Ahlstrand, a probation officer for Du Page County, was admitted into evidence despite its likely prejudicial effect and its irrelevance to the sentencing inquiry. Ms. Ahlstrand interviewed Lori Rowe's mother and Bonnie Serpico's mother, husband and two children and testified as to the emotional effects the defendant's conduct had on them. She related that Lori Rowe's mother stated that her daughter had become very suspicious of people in general, and further reported that Bonnie Serpico's mother had grown depressed and had begun taking tranquilizers. Ms. Ahlstrand also testified that Bonnie's husband felt " 'completely shut out' " after her death and that " 'the biggest loss was that his two daughters would not have a mother to relate to as they were growing up, as they were experiencing young adulthood and marriage, pregnancy, those times when mothers and daughters have a close relationship.' " 94 Ill. 2d at 424-25.

The majority concludes that the defendant waived the issue because he failed to object when the testimony was

admitted. While the general rule is that a failure by defendant to object at trial constitutes a waiver on appeal (see, *e.g., People v. Precup* (1978), 73 Ill. 2d 7), this court has recognized on numerous occasions that plain errors that affect substantial rights of the parties may be addressed even though there was no objection at trial. (*People v. McCarty* (1983), 94 Ill. 2d 28, 36-37; *People v. Jones* (1982), 94 Ill. 2d 275, 294-95; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Brownell* (1980), 79 Ill. 2d 508, 542; see 73 Ill. 2d R. 615(a).) It is all the more important that this court provide an avenue for review of such errors in a capital case, where the defendant's life hinges on such review; few propositions have a longer pedigree in the common law of this State than that any irregularity not *expressly* waived in the trial of a capital case must be heard on review. (*Nomaque v. People* (1825), 1 Ill. (1 Breese) 145, 149; see *People v. Fisher* (1930), 340 Ill. 216, 259.) I see no indication that an express renunciation of any right on appeal occurred here.

To the extent that the majority addresses the merits of the issue, it concludes that this case is distinguishable from cases such as *People v. Bernette* (1964), 30 Ill. 2d 359, in which this court held the admission during the guilt phase of trial of evidence pertaining to a victim's surviving family to be reversible error. However, while it is true that information can be presented at a sentencing hearing "regardless of its admissibility under the rules governing the admission of evidence at criminal trials" (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e)), this does not mean that the discretion of the trial judge in this regard is without limits. The United States Supreme Court and recent decisions of this court have emphasized that "whether a death sentence is proper in a particular case 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of

death' " (94 Ill. 2d at 428, citing *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; see Ill. Const. 1970, art. I, sec. 11; *People v. Szabo* (1983), 94 Ill. 2d 327, 352-53; *People v. Gleckler* (1980), 82 Ill. 2d 145, 162; *People v. Carlson* (1980), 79 Ill. 2d 564, 590), and that trial courts do not have the discretion to admit evidence at sentencing hearings which does not bear on the aggravating or mitigating factors alleged to exist in a given case or on the circumstances of the offense or the character and rehabilitative potential of the defendant, or the probative value of which in this regard is outweighed by its prejudicial effect (*People v. Szabo* (1983), 94 Ill. 2d 327, 363-68; *People v. Devin* (1982), 93 Ill. 2d 326, 346-48; *People v. Walker* (1982), 91 Ill. 2d 502, 515.

It would be difficult to find anything less relevant to the circumstances of this offense or the character of this defendant than testimony concerning the reactions of family members of his unfortunate victims. Their reaction was not to the nature of his crimes or the character of the defendant, but to the fact that the crimes happened. An emotional rendition of the grief of a victim's family, while understandable, can only distract the jury from its weighing of the aggravating and mitigating factors peculiar to this defendant and his crime. Such testimony is always inflammatory. The majority's approval of it in this case will give prosecutors and trial judges the idea that we were not serious in our previous pronouncements, and that there are no limits. Why should they content themselves with the second-hand testimony of a probation officer? Why not put the victim's children on the stand and ask them what life will be like without their mother?

The testimony of Deborah Ahlstrand had no value other than to arouse passion. By allowing its introduction, we run the risk that capital punishment will be imposed in an arbitrary fashion, and ignore the statement of the United States Supreme Court that "[i]t is of vital importance to

the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida* (1977), 430 U.S. 349, 358, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.

JUSTICE CLARK joins in this partial concurrence and partial dissent.